Good morning, Your Honors, and may it please the Court, my name is John Gould. I represent the plaintiff appellant in this case, William O'Hara. With me at counsel table, assisting me on the brief is Stephen Cherkoff, also representing Mr. O'Hara. I start my argument this morning, Your Honors, indicating that the District Court made a fundamental error, a fundamental legal error in its initial approach to this case. The Court found that basically Mr. O'Hara did not have a claim either under the FCA or under ARA because it found that he directed almost entirely his disclosures covered by those laws against a third party and TVI who was not his employer. And it basically read out the protections of those laws from being retaliated against for that reason. This is the only case that we've been able to find, there's nothing the defendant has cited, and even the cases the Court cited for that proposition, there's nothing in the law that justifies that. And the reason is that there's nothing in the statute that justifies it. The statute that protects employees' rights who make these disclosures focuses on the nature of the disclosures, not the party against whom the disclosures are made. And that's where the Court got off the rails right from the get-go. And again, if you'll read the plain wording of the statute, read the cases that we've cited in our brief, you read the cases under other whistleblower laws, there's nothing in the law that justifies the District Court's viewing of the law in this case. And for that reason alone, since it also colored the rest of the Court's decision about whether there was any causal connection between the disclosures and its termination, for that reason alone, the Court should reverse and send this case back to trial. I also point out to you, as we have in our brief, that this would be a very bad precedent for other whistleblowers. The way the world works is that it's often the case, especially in government work, that inspectors, contractors are in there reviewing the government's work, and they are the ones who are finding these possible violations of the law. And so this is repeatedly you see in the cases. These are the people who are coming forward. The Lawson case from the Supreme Court is a perfect example. These are the people who are repeatedly coming forward and making the disclosures about any false claims or, in this case, fraud, waste and abuse or violation of regulations under ERA, who are most likely going to be involved in bringing these cases. So if you adopt the Court's reasoning and the District Court's reasoning, you are going to go, just like Mr. O'Hara was, to the District Court, are going unprotected. And, in fact, if you read the defendant's brief, it doesn't really do a very strong job in defending that part of the Court's decision. It almost immediately shifts to the fact, well, there's no causation here. You didn't have enough evidence to convince a reasonable juror that Mr. O'Hara was terminated because of these violations. And that's just wrong, too, for a number of reasons. The first reason is both the defendant and certainly the District Court didn't look at the statutes, and especially ERA, which has great protections for people who make these disclosures and a very low standard for establishing causation. And Mr. O'Hara, certainly under ERA, and the Court doesn't even mention these burdens in his claims about fraud, waste, abuse, violations of regulations, he clearly met the standard not only for a prima facie case, but also to prove that those disclosures contributed to his termination. So, basically, motive and causation under ERA, under the way Congress worded that statute, like other strong whistleblower protection statutes, like Sarbanes-Oxley and others that the amicus brief has pointed out, under those statutes, there's a presumption of a causal connection between the disclosures just based on temporal proximity and knowledge on the part of the parties involved in the adverse action against the employee. There wasn't any issue about that. Everyone agreed that everyone knew what he had done. Everyone knew that it started, at least with regard to NECA's knowledge, in mid-December of 2009. And by February, Mr. O'Hara was gone. What evidence do you have that NECA had a motive, had an unlawful, improper motive when your client was terminated? Well, there's plenty of circumstantial evidence that its joint employer, the person that it most closely witnessed the government officials did, the people involved in the decision admitted that Mr. O'Hara's disclosures were the beginning of the end for him with regard to his job. They admitted that the flavor was bad, that the whole relationships had gone bad as a result of Mr. O'Hara's disclosures in December. And in addition, I'm sorry, Your Honor. Is there, is the protected activity, the complaints, the issues that he raised with respect to the concrete slab that he considered to be a necessity? That's one of just one. And that is the, the others are the fact that the site plans drawing and what the build-outs were actually were on the construction site, they didn't match. And so for him to be able to do an accurate estimate, something had to be done to coordinate that. He could, did not feel those estimates that he was giving for that subsequent bid that was going to go out on phase two of the project could be accurate. Under error or false claims? He, he, it seemed to me that he was, the thing that he was specifically complaining about according to the attention of various superiors is that he thought that he was being, that the government was going to be billed for this concrete slab that he argued was unnecessary. And that's what he discussed in that December of 09 meeting with Chad Chumlee. Yes, that's correct. And noted that he had been making disclosures about the concrete slab. Yes. Under, under error, if that slab was inappropriate, money would have to be expended under the next phase of the contract to take out wasn't something that wasn't needed, that was gross waste. So that's under error why that's protected. Didn't O'Hara acknowledge himself that the government issued a request for a proposal requesting NTDI to submit a quote for the installation of the concrete slab? Good point, Your Honor. Yes, he did. However... Go ahead. How can a proposal submitted pursuant to a request from the government violate false claims? Because his other allegation was... Stay with me, but that's a critical one. So that's why I'm asking about the concrete slab. Right. So you're, you're acknowledging that the government requested that quote. Well, they certainly acceded to it. I agree with that, yes. Well, there's no, I thought, I thought O'Hara acknowledged that the government... Yes. ...requested for the submission of the quote for the installation. Well, the issue is why. Why did NTDI do that? And what Mr. O'Hara alleged in... What? Submitted? The reason what... Okay. The reason that Mr. O'Hara, and not only was it unnecessary, the concrete slab was put over pipes that were going to be used, Mr. O'Hara was alleging, for the bid that NTDI was going to put on the next contract. So that was the false, potential false claim that he was exposing. It wasn't just the fact that the concrete slab was there. And if you read his affidavit to the IG, if you read his explanation in his deposition, if you read his, the first IG investigation and the second IG investigation, he makes that very clear, that this was part of NTDI's, at least as far as he could see, the only reason he could put two and two together, since it was totally unneeded, these pipes were either new pipes underneath, which were not called for in the site plans, or they put a concrete slab over pipes that were supposed to be abandoned. So what he alleged was, this had to be a scheme, because NTDI was going to use this to, and this is in his allegations, to submit a bid that was based on the next phase of the contract. Since those pipes were going to be used for the next phase of the contract that was going to be put out to bid, to falsify a bid. That's why his claim was protected under the False Claims Act. And in fact, the district court, to point out, Your Honor, the district court didn't have a problem with that. That's not why this case was dismissed on summary judgment. And so I guess that's the best way I can answer the question. So if I can get to more on causation, which, again, was in terms of Judge Traxler's question, there is more than enough evidence for a reasonable jury to find that the NIST officials who controlled Nika's money, who controlled the work on the project, had a motive. In fact, they admitted. In fact, Mr. Conley, who was the major person who was the contract representative, who made all the decisions for the government and passed them along to Nika, which they went along with, he says that in his final statement to the IG, which is on page 748 of the Joint Appendix, that Mr. O'Hara's estimate comments that started this whole thing in December of 2009 were a contributing factor to his decision to rearrange the work, to ask Nika to hire Mr. Hatch, who took over some of Mr. O'Hara's work on the first contract and later performed work on phase two of the project, and also to rearrange the work to another federal employee, Chris Best. The other evidence of a motive, not that we even actually have to prove that, motive is one of the elements of causation, but it certainly is an important element, on Nika's part was that if you read his estimate, Mr. O'Hara's estimate comments, that he attached, and his answers to the questions about NIST's concerns about his bid estimate on the first bid estimate that he put, he's criticized heavily by Mr. Snuffer, another contract representative from the government, and Nika sides with Mr. Snuffer and basically apologizes that Mr. O'Hara had the temerity to put these disclosures in his estimate comments, agrees that they're totally inappropriate. So I think that there is a flavor that they were going along, going along to get along with the government. Sorry, Your Honor. I apologize. I have a heavy cold, so I wasn't sure I was making myself clear. So I guess that's the best way I can answer the question, the estimate comments, the way those were dealt with. Mr. O'Hara, there's an email from Mr. O'Hara that tells Nika that it's becoming contentious. So everything is before Nika. They either knew or should have known, which is the standard the defendant says should be adopted by the court. They either knew or should have known that Mr. O'Hara's disclosures were contributing to his termination, and they participated in it and that they agreed to hire his replacement, Mr. Hatch. And also, on the rest of the bids that they were finishing up on Phase 2, they hired a separate independent contractor, CCS, to replace Mr. O'Hara's work on that part of the project. And in fact, as we pointed out, the reason to do that doesn't make any sense because they felt that Mr. O'Hara couldn't finish them on time, but then CCS came in and they gave them an extension. Okay, my time is up, and I don't want to go into my rebuttal. All right. Thank you, Your Honor. It's Geiger. Good morning, Your Honor. May it please the Court, Cliff Geiger on behalf of NECA Technologies. The appellant here wants to have a case based on facts that simply don't exist in this record. Do you agree that the district court just got it wrong about the retaliation having to be about the, I'm sorry, about protecting about 3730, protecting activity that could lead to an action by the employer that has to be the employer? I agree that that is a difficult standard to apply in a motion to dismiss case. So you, I'm not sure, do you think it's correct? Do you think it's correct to take a little bit off? I think given the record as a whole, in this case, and what the judge was looking at, and this is a question that has nothing to do with the record. The question is can a whistleblower case be limited where the false report, false action is by the employer or the person who fired it. That's just a question of law. And the answer to that is a matter of statutory construction and public policy is that that is not the law. That is not the law. But this court is not limited to the judge's reason. As a starting point. So the court is not limited by that statement of law in affirming. I wasn't getting to that. You're going to argue that you can affirm for all the reasons. I just wanted to know if you were in agreement that that is not the right statement of the law. Well, the Fourth Circuit has not decided that. I find it hard to believe that the Fourth Circuit would decide that. I've heard that a lot. But at its root, this case is like any other employment discrimination case. There is. And what I started to say was that this is a case that Mr. O'Hara would like to have but he doesn't have. Just like Judge Grimm and the appellant in this case didn't cite cases directly on point. The facts of the cases cited by the appellant demonstrate when compared to the facts of our case, which are undisputed, that simply isn't what was going on in his case. As I understood his argument, it is that his case relies on circumstantial evidence. His case relies on circumstantial evidence. His case relies on circumstantial evidence related to the motives of NIST officials over and over again. It's NIST officials and Conley. And what we have in this case is we have a line item in a government task order to provide for certain services, a senior cost estimator. That was what Mr. O'Hara did. That was what he was hired to do, only do, only thing he ever did while he was employed by NECA. That was the source of the funding. That was the source of the work. That was it. What happened was that funding was not continued. It was not continued beyond February 2009. NECA found out from Albert Petto, the contracting officer, not from Chris Conley. I misstated that in my brief. I apologize for that. But NECA found out from Albert Petto, the contracting officer, who was not involved in any of Mr. O'Hara's disclosures or allegations of wrongdoing, that NIST had decided that it was not going to continue that funding. And NECA did the only reasonable thing it could do under the circumstances. Without a source of work, without a source of funding, it let Mr. O'Hara go. What I was going to say is that what the appellant here wants to do is build inference upon inference, add in a dash of speculation and say, based on this record, you can find that NECA had some illegal motive. What the record establishes in this case is that NECA's sole motive was to make the business decision that there was no funding and therefore no work and therefore no job for Mr. O'Hara. Mr. Chaudhry, the focus on this case is on the decision maker. Like it is in any employment discrimination case. The decision maker here is Mr. Chaudhry. The decision maker here is not Chris Conley, it's not Albert Petto, it's not any one of the number of people that the appellant identifies later on as being involved in this grand conspiracy against him. It's Mr. Chaudhry. Mr. Chaudhry has a small business to run. He has a staff augmentation contract with the government. The government decides that it is not going to continue to fund that position. Now, there's this joint employer theory out there and attributing NIST's intentions to Chaudhry, the decision maker, and what I have to say to that is that there's no reasonable basis for any of this. There's no reason for anyone to infer that Chaudhry had any legal motive. Mr. Chaudhry was asked at his deposition, so you must have had discussions with NIST about replacing Mr. O'Hara and some preliminary lead up to that. Mr. Chaudhry said no. I got an email from the contracting officer telling me to stop billing for that position. And I didn't find that unusual. It's happened with other agencies. It's happened in the past. And it happened here. And there was no reason to suspect that Mr. Petto had any legal motive. So what I started to say, and I promise I will get to the protected activity issue, is that this is not the Booz Allen case that the appellant cites where the plaintiff was essentially told, hey, knock it off. Don't complain about our subcontractor because the government's not going to like it. And if you do that, you're going to endanger your position in our contract. And then she was later terminated for a bad attitude. That's not what happened here. It's not even close. This isn't the city of Cleveland case where the city had a former employee who went to work for a contractor. And then the city found out that that employee of that contractor had active false claim litigation against it. And then the city said, hey, contractor, get that guy off of all of our contracts that you're doing work for us. That's not what happened either. What happened here, again, there was a staff augmentation contract. Funding ran out. The contracting officer made the notification. And Chaudhry made the decision he had to make. There's zero evidence that a reasonable fact finder could find that Mr. O'Hara was replaced. There's no evidence that another senior cost estimator was hired. There's no evidence that NECA directed any cost estimating services to be performed on the contract. What there is, is there's evidence that NIST decided how it was going to allocate its funding based on the phase of the contract, the type of the funding, whether it was AERO, whether it was non-AERO, based on what positions NIST felt it needed to complete the project. What evidence is there of communications between NIST and NECA regarding Mr. O'Hara? And his work on behalf of NIST? The evidence of communication between NECA and NIST is when, well I could go back to when Mr. O'Hara was hired, because he had been working at the location for several years. The way this works is the government says, I want a senior cost estimator, you might want to talk to Bill O'Hara. And so that was one form of communication. Communication regarding the funding of his position, the defunding of his position, the only communication was from Albert Petto to Chaudhry in February 2010. There's no other evidence in this record regarding that. There are other communications that took place with regard to the disclosures and cost estimates, if you will. And that communication relates to these cost estimate comments that Mr. O'Hara placed in one of the things that he put together that was submitted directly to the government. And in connection with that communication, one of the government representatives, Mr. Snowfer, indicated that, don't put those comments in here, put them someplace else. He did not say don't make those comments. He said, I want a cost estimate, don't put them in this document, put them in a different document. Mr. O'Hara agreed to do that. That's what NECA also agreed to do. And that was it. And then what came out of those comments was NECA saying, hey, Bill, you've got to let us know whether we need to bring those to the government's attention. No, it shows that there was no animus or retaliatory motive or anything like that. NECA was trying to get to the bottom. And there's nothing in the communication between NECA officials or between NECA and O'Hara about those disclosures that says that O'Hara was causing problems by those disclosures. The problem was that he put that information in a cost estimate deliverable instead of putting it somewhere else. And that is what Pete Ludgate testified to. That is what the document shows for Mr. Snowfer, and that is what Chaudhry testified to. That the issue isn't you can't make those comments or that they're not inappropriate. It was just don't put them there, we want them somewhere else, and that's how we can take care of them. And that is, in fact, what NECA did or attempted to do. It was follow through and figure out in the best interest of the contract whether there was anything there. And Mr. O'Hara acknowledged later on that the change that the government requested, that quote. So I'm not sure, it seems to me that that's a pretty useful predictive for you. Because if you can't come in on protected activity, you don't have to go very far beyond that. Well, we don't take the position that those estimate comments or anything that the government requested NECA to do, that's the complete disconnect in Mr. O'Hara's case. The allegations regarding this protective slab and what NECA knew about it, very little. And what appear on their face to be inaccuracies about site conditions simply aren't enough to constitute protected activity under the False Claims Act or under ERA. There's no indication that there's gross mismanagement or gross waste or anything of the sort in connection with those particular disclosures. So as I was saying, the issue in this case ultimately is NECA's, Mr. Chaudhary's motivation. I've gone over that now several times and I've explained how NECA couldn't do anything different or play no part in NIST's decisions about how it was going to complete its construction projects. If we establish that there's protected activity, which the estimate comments don't meet that threshold, and if we accept that at least NECA knew that there was some protected activity, then the ultimate burden here, like in any employment discrimination case, is that the adverse action against Mr. O'Hara was taken because of the protected activity. And NECA has set forth what its reasons were, simple as Mr. Petto said there's no more funding for the position. I don't think that's in dispute. There's no evidence that that is pretext. What the appellant wants you to do in this case is say, well, NIST didn't have to make that decision because it could have done things a different way. I don't think this court is in a position to decide the ins and outs of how construction projects should be managed most efficiently, and NECA certainly wasn't in that position either. Your Honors, I don't have anything else unless you would like to ask me any questions. I think we're in a standing position. Okay, thank you. Thank you, Your Honors. If we're going to focus on Mr. Chowdhury, and I understand why defense counsel wants to do that, you have to keep in mind that this is not like any other employment discrimination case. This is not, at least under ERA, the statute reads completely differently. Once there's a temporal proximity between protected disclosure and an adverse action, that's it. It's considered to be a contributing factor, motive on anybody's part doesn't matter. The burden shifts to the defendant to prove by clear and convincing evidence that some unrelated reason caused determination. Again, they put forward some reasons, but that's a jury question. That's not a question, and again, with all due respect to defense counsel, his argument to this court sounded like a closing argument to a jury, which is fine. We understand their position. They're going to have a position at trial. The question before this court is whether there's sufficient evidence for a reasonable jury to decide that NICA cannot come forward with clear and convincing evidence that it had some unrelated reason. And all it can come up with for that is, well, the government stopped our funding. Well, that's like saying somebody died because he stopped breathing. I mean, no one's disputing that, but this statute requires the court to look beyond that. In fact, we're required to look beyond that. Mr. Geiger says the work stopped. Mr. Chaudhry knew that couldn't be true. Mr. Ludgate, who was in charge of phase two of the bid project, they just got over $180 million of new era money for the second phase of that contract. There were going to be change orders, cost estimating involved in that contract. There was still work to be done. Mr. Connolly indicates that. There's no dispute about that. So Mr. Chaudhry and certainly Mr. Ludgate knew that. Their meeting every week, if you see, there's on Joint Appendix 191, there's a meeting in which NTVI and NICA are asked to work together with NIST to work on further change orders on phase one of the contract. So Mr. Chaudhry's pretension that he doesn't know what's going on here. Again, that can be an argument to a jury, I suppose. And if the jury buys that, perhaps they could decide that that is some unrelated reason to Mr. O'Hara's disclosures that caused his termination. But that's not the issue. Shouldn't have been the issue for the district court. It's not the issue for this court. The issue for this court is whether a reasonable jury could decide, based on our evidence, which I pointed out to the court today and in our briefs, that his disclosures were a contributing factor and that NICA and NIST, its partner in all of this, had no other reason unrelated to those disclosures. And again, that's when we'll get into, we'll argue about the issue of pretext, and we've pointed out we have plenty of that. Again, Mr. Hatch was doing most of Mr. O'Hara's job. There was nothing in Mr. Hatch, the rest of his job, quality assurance that Mr. Hatch testified to that Mr. O'Hara hadn't done. In fact, it was part of the quality assurance that he was pointing, that the lack of quality in the build-outs, corresponding to the design plans, in which he uncovered some of these issues. So Mr. Chowdhury knew that they had just brought in a new person to do a lot of this work, or were close to what Mr. O'Hara could have done. So there's plenty of evidence that Mr. Chowdhury knew, or certainly he should have known, and certainly there's plenty of evidence that NICA participated. And again, we don't necessarily have to prove that Mr. Chowdhury had some kind of malicious motive to get rid of Mr. O'Hara. What's your best case that says temporal proximity is all you have to show? This is the only case under error, but I think the Sarbanes-Oxley cases that I pointed to, Don't give me a whole bunch of cases. Give me what's the single best case you've got to allow temporal proximity without the benefit of any inferences to simply all you have to prove. Give me a minute, Your Honor. I think you can go get some help here. Thank you, Your Honor. Point out the statute says it, but cases interpreting similar statutes have indicated that intent and motive are not issues in cases like under Sarbanes-Oxley that have similar statutes, and I'll find those sites in a second. Let me ask about the case standing for the proposition that proximity alone is enough. Proximity alone and knowledge of the disclosures. You said, as I understood you to say, and maybe I misheard you, that temporal proximity was all you needed to show, and that that showing alone was enough to put a burden on the employer for them to come forward. Well, if I did say that in quoting the statute, it's actually temporal proximity combined with knowledge of the disclosures. So you don't have a case. You don't have a case for judge traction. Not just, I never meant to say, and I apologize to the Court if I said that. I didn't mean to say that. It's the statute, and if you read the statute, it says temporal proximity plus knowledge of the disclosures means that we can presume that these disclosures were a contributing factor to the adverse action, shifting the burden to the employer to prove by clear and convincing evidence that it had some other reason. Okay. We're all square now. All right. Thank you. Okay. Thank you. I'll ask the Court to adjourn court, and then you'll come down and do counsel.
judges: William B. Traxler Jr., Robert B. King, Allyson K. Duncan